IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 1:24-cr-180-PTG-1 |
| | ) | |
| RAYMOND RAHBAR, | ) | Hon. Patricia Tolliver Giles |
| Defendant. | ) | |

## RAYMOND RAHBAR'S MEMORANDUM IN AID OF SENTENCING

# TABLE OF CONTENTS

Page

II.  SENTENCING GUIDELINE CALCULATIONS AND DEFENSE OBJECTIONS. ........................................................................................1

    A.  PSR Guideline Calculations. ......................................................................1

    B.  Mr. Rahbar's Objections. ...........................................................................2

        1.  Loss amount under U.S.S.G. § 2B1.1(b)(1)(J). ..............................2

        2.  Fraud during Bankruptcy under U.S.S.G. § 2B1.1(b)(9)(B). ....................6

        3.  Abuse of Public/Private Trust under U.S.S.G. § 3B1.3. ............................7

        4.  Acceptance of Responsibility under U.S.S.G. § 3E1.1(b). .......................8

III.  NON-GUIDELINE CONSIDERATIONS UNDER 18 U.S.C. § 3553(A)......................11

    A.  Mr. Rahbar's History and Characteristics. ...........................................12

        1.  Background and Community Involvement. ...........................................12

        2.  Mr. Rahbar Is a Good and Decent Man. ................................................16

        3.  Mr. Rahbar Is a Generous and Charitable Person Who Has Positively Impacted Many Lives. .......................................................17

        4.  The Offense Conduct Was Out of Character. .........................................19

        5.  Mr. Rahbar is Genuinely Remorseful. ...................................................21

        6.  Mr. Rahbar Lacks a Prior Criminal Record. ..........................................23

        7.  Mr. Rahbar Has a Strong Community of Support. ..................................24

    B.  The Nature and Circumstances of the Offense. ....................................25

    C.  Deterrence and the Need to Protect the Public from Future Crimes of the Defendant. ..............................................................................29

    D.  Seriousness of Offense, Respect for the Law, and Just Punishment. ...................30

    E.  Need to Avoid Unwarranted Sentencing Disparities. ...........................................31

        1.  PPP Loan Fraud Cases in This District. ..................................................32

            a.  United States v. Rudin, 1:22-cr-00046-AJT. ..............................32

            b.  United States v. Rosenburg, 1:24-cr-00061-CMH. ...................33

            c.  United States v. Magee, 1:23-cr-00091-CMH. ..........................33

            d.  United States v. Ouedraogo, 1:23-cr-00183-CMH. ...................34

            e.  Comparable Cases Demonstrate the Appropriateness of a Downward Variance in This Case. .............................................35

        2.  Cases Involving Aggravated Identity Theft. ...........................................37

IV.    IMPOSITION OF A FINE. ........................................................................................39

V.    RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BUREAU OF PRISON. ........................................................................................................39

VI.    COMMUNITY RE-ENTRY AND REHABILITATION. ............................................39

VII.    CONCLUSION. ......................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

### Cases

*Gall v. United States,*
   552 U.S. 38 (2007) ..................................................................................11

*Nelson v. United States,*
   555 U.S. 350 (2009) ................................................................................11

*Pepper v. United States,*
   562 U.S. 476 (2011) ............................................................................1, 12

*U.S. v. Moore,*
   29 F.3d 175 (4th Cir. 1994).......................................................................7

*United States v. Agbere,*
   1:21-cr-223 ...............................................................................................37

*United States v. Aqeel,*
   20-CR-00583, Dkt. 136 ............................................................................38

*United States v. Baker,*
   445 F.3d 987 (7th Cir. 2006)....................................................................24

*United States v. Beach,*
   275 Fed. Appx. 529 (6th Cir. 2008).........................................................22

*United States v. Bleicher,*
   2020 U.S. Dist. LEXIS 92027 (D. N.J. 2020) .........................................23

*United States v. Boler,*
   115 F.4th 316 (4th Cir. 2024).....................................................................2

*United States v. Booker,*
   543 U.S. 220 (2005) ...........................................................................11, 31

*United States v. Caplinger,*
   339 F.3d 226 (4th Cir. 2003).....................................................................7

*United States v. Cherry,*
   487 F.3d 366 (6th Cir. 2007)....................................................................29

*United States v. Coghill,*
   204 Fed.Appx 328 (4th Cir. 2006) ........................................................3, 5

*United States v. Darway,*
   Fed. Appx. 68 (6th Cir. 2007) .................................................................23

*United States v. Davis,*
   458 F.3d 491 (6th Cir. 2006), *vacated on other grounds by Gall v. United*
   *States*, 552 U.S. 38 (2007) .......................................................................22

*United States v. DeRuse,*
    859 F.3d 1232 (10th Cir. 2017)..................................................................21

*United States v. Desirade,*
    1:24-cr-40, Dkts. 106 (E.D. Va. Oct. 2, 2023) ..........................................37

*United States v. Divens,*
    650 F.3d 343 (4th Cir. 2011).......................................................................9

*United States v. Ebersole,*
    411 F.3d 517 (4th Cir. 2005).......................................................................7

*United States v. Eldabbagh,*
    21-CR-00523, Dkt. 1 ................................................................................38

*United States v. Hayes,*
    22-CR-00224 ............................................................................................38

*United States v. Johnson,*
    2021 U.S. Dist. LEXIS 34217 (W.D. Pa. 2021) ......................................23

*United States v. Kosth,*
    943 F.2d 798 (7th Cir. 1991).......................................................................8

*United States v. Lee,*
    653 F.3d 170 (2d Cir. 2011)........................................................................9

*United States v. Lynch,*
    8:24-cr-0137-LKG (D. Md.) .....................................................................10

*United States v. Magee,*
    1:23-cr-00091-CMH (E.D. Va. 2023).................................................33, 34

*United States v. Martin,*
    520 F.3d 87 (1st Cir. 2008)........................................................................25

*United States v. Merritt,*
    1:24-cr-98, Dkt. 94 (E.D. Va. Nov. 13, 2024)..........................................37

*United States v. Meyers,*
    353 F. Supp. 2d 1026 (S.D. Iowa 2005) ...................................................30

*United States v. Ouedraogo,*
    1:23-cr-00183-CMH (E.D. Va. 2023)........................................................30

*United States v. Plowden,*
    1:23-cr-00198-LMB (E.D. Va. 2023)..........................................................9

*United States v. Qualls,*
    373 F. Supp. 2d 873 (E.D. Wis. 2005)......................................................24

*United States v. Ramos-Hernandez,*
    24-CR-00252, Dkt. 3 ................................................................................37

*United States v. Rios-Rivera*,
   913 F.3d 38 (1st Cir. 2019) ................................................................... 22

*United States v. Rosenberg*,
   1:24-cr-00061-CMH (E.D. Va. 2024) ..................................................... 33

*United States v. Rudin*,
   1:22-cr-00046-AJT (E.D. Va. 2022) ........................................................ 32

*United States v. Sadleir*,
   20-CR-00320, Dkt. 87 (S.D.N.Y., Sept. 9, 2022) ................................... 38

*United States v. Santiago*,
   1:23-cr-193, Dkts. 55 (E.D. Va. May 3, 2024) ....................................... 37

*United States v. Shephard*,
   892 F.3d 666 (4th Cir. 2018) ............................................................... 2, 4

*United States v. Smith*,
   2008 WL 1816564 (4th Cir. 2008) ......................................................... 23

*United States v. Stall*,
   581 F.3d 276 (6th Cir. 2009) .................................................................. 25

*United States v. Staveley*,
   20-CR-00074, Dkt. 51 (D. R.I. Oct. 12, 2021) ....................................... 38

*United States v. Taylor*,
   2022 U.S. Dist. LEXIS 86082 (S.D. W.Va. 2022) ................................. 23

*United States v. Tisone*,
   22-CR-00039, Dkt. 19 ............................................................................ 38

*United States v. Torres-Perez*,
   777 F.3d 764 (5th Cir. 2015) .................................................................... 9

*United States v. Huckins*,
   529 F.3d 1312 (10th Cir. 2008) .............................................................. 23

*United States v. Urbina*,
   2009 U.S. Dist. LEXIS 18239 (E.D. Wis. 2009) ............................... 24, 25

*United States v. Willhoit*,
   1:22-cr-191, Dkts. 148 (E.D. Va. June 14, 2023) ................................... 37

*United States v. Wilson*,
   980 F.2d 259 (4th Cir. 1992) ............................................................... 3, 4

## Statutes

18 U.S.C. § 1028A .................................................................................... 39

18 U.S.C. § 2252(a)(1) .................................................................22

18 U.S.C. § 3553(a) ..........................................1, 6, 11, 21, 24, 29, 31, 36, 37, 39

18 U.S.C. § 3621 ........................................................................39

18 U.S.C. § 3621(4)(A) ..................................................................39

18 U.S.C. § 3621(4)(B) ..................................................................39

18 U.S.C. § 3661 ........................................................................12

U.S.S.G. § 2B1.1(b)(1)(A) ................................................................2

U.S.S.G. § 2B1.1(b)(9)(B).............................................................6, 7

U.S.S.G. §2B1.1(b)(10)(C) ....................................................33, 24, 35

U.S.S.G. § 2B1.1(b)(11)(4) ..............................................................33

U.S.S.G. §2B1.1(b)(17)(A)......................................................1, 33, 34, 35

U.S.S.G. §2B1.1(b)(1)(J) .......................................................33, 34, 35

U.S.S.G. §3B1.1(a) ....................................................................34

U.S.S.G. § 3B1.1(b) ....................................................................32

U.S.S.G. § 3B1.3.........................................................................7

U.S.S.G. § 3C1.1(b) ....................................................................34

U.S.S.G. § 3E1.1(a) ....................................................................34

U.S.S.G. § 3E1.1(b) ............................................................8, 9, 10, 23

U.S.S.G. § 5E1.2(e) ....................................................................39

U.S.S.G. § 5K2.20 .....................................................................21

## Other Authorities

Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of
    Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ...........................30

Michael Massoglia and Christopher Uggen, *Settling Down and Aging Out:
    Toward an Interactionist Theory of Desistance and the Transition to
    Adulthood*, Am. J. Soc., 116(2), at 543 (Sept. 1, 2010) .......................29

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006)..................30

Paul H. Robinson, *Distributive Principles of Criminal Law*, at 223 (2008)..............................30

Symposium, U.S.S.C, Federal Sentencing Policy for Economic Crimes and New
     Technology Offenses, Plenary Session I, *What Social Science can Contribute
     to Sentencing Policy for Economic Crimes*, at 22 (Oct. 12, 2000), *available at*
     https://www.ussc.gov/research/research-and-publications/research-projects-
     and-surveys/united-states-sentencing-commissionsymposium-federal-
     sentencing-policy-economic-crimes-and-new ...................................................................30

U.S.S.C. Measuring Recidivism: The Criminal History Computation of the
     Federal Sentencing Guidelines, at 28, Ex. 9 (May 2004), *available at*
     https://www.ussc.gov/sites/default/files/pdf/research-and-
     publications/research-
     publications/2004/200405_Recidivism_Criminal_History.pdf ...........................................29

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice
     Paradigm:Restorative Justice and White Collar Crime*, 9 Cardozo J. Conflict
     Resol. 421, 448-49 (2007) ...................................................................................................29

## I.    INTRODUCTION.

Raymond Rahbar, through counsel, files this Memorandum in Aid of Sentencing to highlight the numerous mitigating factors in this case and assist the Court in its "overarching duty under § 3553(a) to impose a sentence sufficient but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (internal quotes omitted). In support of a total sentence between thirty and thirty-six (30–36) months imprisonment, followed by three (3) years of supervised release, which varies below the range recommended in the Presentence Report ("PSR"), Mr. Rahbar submits the following:

## II.    SENTENCING GUIDELINE CALCULATIONS AND DEFENSE OBJECTIONS.

### A.    PSR Guideline Calculations.

The PSR calculates Mr. Rahbar's base offense level to be seven (7), pursuant to U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§ 2B1.1(a)(1) and 2X1.1, his Criminal History Category as I. PSR at ¶¶ 52, 73. Mr. Rahbar has no objections to these calculations. However, the PSR then recommends an eighteen (18) level enhancement, under U.S.S.G. § 2B3.1(b)(1)(J), claiming the loss amount was between $3.5–$9.5 million, a two-level enhancement, under U.S.S.G. § 2B3.1(b)(9)(B), claiming the offense involved a fraudulent action during a bankruptcy proceeding, and a two-level enhancement, under U.S.S.G. § 3B1.3, because Mr. Rahbar allegedly abused a position of public or private trust. PSR at ¶¶ 53, 55, 58.[1] Mr. Rahbar objects to the application of each of these three enhancements, as discussed herein. Next, the PSR recommends a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved ten or more victims, a two-level enhancement under U.S.S.G. § 2B1.1(b)(17)(A), because more than $1 million in gross receipts was derived from one or more financial institutions, and a two-level

---

[1] Mr. Rahbar withdraws his objection the Probation Office's recommendation for an enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i), based upon clarification provided in the Final PSR. PSR at 25.

adjustment for Mr. Rahbar's role in the offense. U.S.S.G. § 3B1.1(c); PSR at ¶¶ 54, 56, 59. Mr. Rahbar does not object to these three calculations. While the PSR recognizes Mr. Rahbar has clearly accepted responsibility for his offense conduct,[2] the PSR recommends only a two-level decrease, under U.S.S.G. § 3E1.1(a) for acceptance of responsibility. PSR at ¶ 68. Mr. Rahbar objects to this recommendation. Accordingly, the PSR determines Mr. Rahbar's Total Offense Level to be 33, and recommended a Guideline range for Count 1 to be 135–168 months. PSR at ¶¶ 66, 98, 99. Mr. Rahbar objects to this recommendation.

For the reasons that follow, Mr. Rahbar submits that the correct adjusted offense level should be 26 and, because his Criminal History Category is I, the correct sentencing range should be 63–78 months. Further, Mr. Rahbar acknowledges that for Count 12, he faces a mandatory minimum sentence of 24 months.

### B.  Mr. Rahbar's Objections.

### 1.  Loss amount under U.S.S.G. § 2B1.1(b)(1)(J).

The PSR overstates the loss amount attributable to bank fraud, abandoning any effort to distinguish legitimate from illicit loan proceeds. The Guidelines require that differentiation. Under the Guidelines, "loss" is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1)(A). Actual loss is the "reasonably foreseeable pecuniary harm" which "resulted from the offense," while intended loss is the "pecuniary harm that the defendant purposely sought to inflict" including what was intended but did not occur. *Id*.; *see also United States v. Boler*, 115 F.4th 316, 328–29 (4th Cir. 2024). It is the government's burden to "establish the amount of loss by a preponderance of the evidence." *United States v. Shephard*, 892 F.3d 666, 673 (4th Cir. 2018).

---

[2] In addition to admitting his guilty and pleading guilty, Mr. Rahbar has demonstrated his acceptance of responsibility by submitting a letter to this Court which outlines in detail he remorse for his crime, full acceptance of responsibility for his actions and also the distorted thinking that contributed to his offense and, most important, his awareness of the harm he caused to the community and the true victims of his crime. Ex. 1 (Raymond Rahbar Letter) at 1–2, 5–6.

Here, the PSR calculates a total loss amount of $4,004,777 with $3,252,515 in actual loss and $752,265 in intended loss. PSR ¶¶ 39–43. Mr. Rahbar respectfully objects to the inclusion of the entirety of each loan amount in the loss calculation. The funds to which an entity was legitimately entitled based on the PPP rules should not be included in the loss amount.

Generally, "[t]he task of the district court is to determine the amount of loss that is attributable to [defendant]'s criminal conduct." *United States v. Wilson*, 980 F.2d 259, 262 (4th Cir. 1992). Where, as here, only part of the loss is attributable to the defendant's false statement, the calculated loss should be the amount of the loan, "less the estimated amount the bank would have lost had the statement not been false." *Id*. Although *Wilson* involved a false statement made after the loan application was submitted, courts applying *Wilson* have agreed that "loss should be calculated based on the value of the loans procured through fraud, not including outstanding legitimate loans." *United States v. Coghill*, 204 F. App'x 328, 330 (4th Cir. 2006) (citing *Wilson* as a case "limiting amount of loss . . . to the amount of loss related to the false statement, rather than the total loan amount"). That principle should apply with full force in the PPP loan context.

The PPP operated differently than traditional commercial lending. Based on a fixed formula, business owners and operators could apply for and receive funds based on their stated payroll expenses. How much payroll a business reported increased or decreased the amount which it was eligible to receive. Mr. Rahbar admitted through his plea agreement to inflating the amount of employees and payroll for various entities in order to increase the amount of PPP funds awarded. Dkt. 110 at 649–50. However, Mr. Rahbar maintains, and the Government has agreed, that a portion of the payroll he submitted was legitimate. *See* PSR ¶ 36 (admitting that "some of the people listed on the PPP loan applications were actual employees of BYNDfit"). Several witnesses interviewed by the Government reported having worked for one or more of the businesses during

3

the relevant time period. Further, the letter the Government provided to Mr. Rahbar's counsel in response to this Court's instruction regarding his Motion for Bill of Particulars further confirms that the Government believes some individuals were employed by BYNDfit in February 2020. *See* Ex. 2 at 1 ("That said, we believe that as of February 15, 2020, BYNDfit employed about seven people."). Under the fixed PPP loan formula, legitimate payroll accounts for a calculable and significant portion of the funds received by Mr. Rahbar's entities. These were funds to which the entities—shuttered by pandemic lockdowns during the critical first months of operation—were entitled under the PPP. The loan amounts supported by legitimate payroll can be neither actual nor intended loss, as they are not attributable to Mr. Rahbar's criminal conduct. *See Wilson*, 980 F.2d at 262.

The PSR does not even attempt to parse the legitimate and illegitimate amounts based on the available evidence. Instead, it attributes the entirety of each PPP loan to Mr. Rahbar's false statements. This fails to satisfy the Government's burden to "establish the amount of loss by a preponderance of the evidence." *Shephard*, 892 F.3d at 673.

In defense of its calculation, the PSR offers three arguments, none of which comport with the Guidelines (or, to the extent the Government relies on the PSR calculation, satisfy the Government's burden).[3] First, the PSR claims it is not required to make this calculation because Application Note 3(D) of U.S.S.G. § 2B1.1 "lists certain instances in which the loss amount can be reduced, none of which includes the defendant's argument that some of the payroll expenses listed on the loans were legitimate." PSR at 23. But Application Note 3(D) provides examples of costs that should be "credit[ed] against loss" ***after*** the loss amount is calculated. It does not dictate

---

[3] The PSR does not address the loan calculations for any of the loans associated with AMC Building and American Majestic—companies associated with the late-Mr. Rahbar's business that fell to Mr. Rahbar after his father's death in 2019. Like the BYNDfit entities, these were associated with an indisputably legitimate construction business. The loss calculations make no effort to identify the amount by which these applications were inflated, either.

what qualifies as the loss itself, and courts must still consider the "value of the loans procured through fraud" when making this calculation. *See Coghill*, 204 F. App'x. at 330. Regardless, the list is not—and does not purport to be—exhaustive.

Second, the PSR states that "only one entity reported paying payroll taxes" during the time periods for which the loans were submitted. PSR at 23. But PPP loan calculations were not based on the amount of payroll taxes; they were calculated using the number of employees, in addition to payroll costs, which could include payments to independent contractors up to a specified amount. It is unsurprising that, as a brand-new startup, BYNDfit was still working through the process of onboarding new individuals to its payment processor in early 2020, and that many individuals who performed work for BYNDfit were independent contractors who would not have appeared on payroll taxes. The reported payroll tax amount is not dispositive and does not satisfy the Government's burden.

Finally, the PSR summarily concludes that legitimate PPP loan calculations should be included in the loss calculation because the loan proceeds were "improperly spent." *Id.* The PSR offers no support for this conclusion. A significant portion of the loans' proceeds—over $180,000 for BF Chinatown's first loan alone—were deposited with Gusto for payment to individuals who worked or performed work for BYNDfit. The PSR claims that "many" of the individuals who received money through Gusto were asked to send the money back to Rahbar but names only four individuals to whom this applies: three had ownership stakes in the business, and two were never interviewed by the Government. The PSR does not account for payments to any other individuals, including independent contractors. It further fails to acknowledge legitimate non-payroll expenses such as utilities, rent, debts, and supplier costs essential to gym operations. To avoid accounting for these expenses, the PSR later states that "[s]ince the loan was improperly obtained, how [Mr.

Rahbar] spent the money is completely irrelevant for purposes of loss amount calculation." PSR at 24. The PSR cannot justify excluding any loan proceeds supported by legitimate employees and payroll expenses from the loss amount calculation by claiming that Mr. Rahbar improperly spent the proceeds *and* dismiss legitimate expenditures by claiming that how Mr. Rahbar spent the money is irrelevant to the loss calculation. This reasoning is circular and fails to support the loss amount calculation by a preponderance of the evidence.

Because the Government has failed to establish a loss amount of at least $3,500,000, the correct enhancement under U.S.S.G. § 2B1.1(b)(1)(I) is only sixteen levels. Dkt. 110 at ¶ 16 (acknowledging "at least $3.1 million in PPP loans"). Regardless, because $752,265 of the total amount of loss was comprised of loans that Mr. Rahbar withdrew or failed to submit adequate documentation to secure, PSR at ¶¶ 40, 43, the assertion these amounts be included as intended loss is tenuous at best and warrants a variance under 18 U.S.C § 3553(a)(x) because no economic harm occurred.

### 2.    Fraud during Bankruptcy under U.S.S.G. § 2B1.1(b)(9)(B).

The PSR includes a two-level enhancement pursuant to U.S.S.G. §2B1.1(b)(9)(B), claiming that the "offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." PSR ¶ 55. In support, the PSR includes only a single paragraph claiming Mr. Rahbar made false statements during one bankruptcy proceeding for a BYNDfit entity. The full question and response—which took place on August 3, 2023—is as follows:

> Mr. Scher: BF Management took a second draw PPP from City First Bank, NA for 244,945 dollars in 2021. In support of that loan application, you submitted a Form 941 for the first quarter of 2020, listing $246,666.66 in payroll. Did BF Management actually pay $246,666.66 to its employees in the first quarter of 2020?
>
> Mr. Rahbar: I believe so, yes.[4]

---

[4] *See* US-00033661 at US-00033746–47 (available upon request).

Mr. Rahbar's response that "I believe so, yes", over three years after the pay period in question, is plainly vague. It is no surprise that BYNDfit filed for bankruptcy. As the PSR acknowledges, "BYNDfit was failing." It could not pay its debts. The dismissals were largely based on the courts' findings that the cases were part of a dispute between BYNDfit and Terrell Place, the landlord for the BYNDfit Chinatown location. But the proceedings were not part of an effort to evade detection of PPP loan fraud, and any vague statements Mr. Rahbar made about his "belie[f]" during them do not constitute relevant conduct under the Guidelines. The PSR offers no other evidence to support its claim that Mr. Rahbar made other, unspecified false statements during the proceeding identified, or how the proceedings were relevant conduct under the Guidelines. Accordingly, the two-level enhancement pursuant to U.S.S.G. §2B1.1(b)(9)(B) is misapplied.

### 3.    Abuse of Public/Private Trust under U.S.S.G. § 3B1.3.

The offense level adjustment for an abuse of position of trust or use of a special skill applies when a defendant used the position or skill "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. For the enhancement to apply, a trust relationship must exist between the defendant and victim from the victim's perspective. *See United States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003). "[F]raud alone cannot justify the § 3B1.3 enhancement." *United States v. Ebersole*, 411 F.3d 517, 536 (4th Cir. 2005). It requires "[s]omething more akin to a fiduciary function" and "more than a mere showing that the victim had confidence in defendant." *Id.* (quoting *Caplinger*, 339 F.3d at 237).

Here, the victims of the charged conduct are the banks and one individual. Mr. Rahbar did not hold a position of trust with either. Regarding the banks, Mr. Rahbar's relationship with them as a loan applicant was an "ordinary commercial relationship[]" insufficient to create a position of trust. *U.S. v. Moore*, 29 F.3d 175, 180 (4th Cir. 1994). As other courts have recognized, a bank's

reliance on a customer's representations alone does not create a trust relationship between the bank and customer. For example, in *United States v. Kosth*, the Seventh Circuit reversed the application of this enhancement to a defendant who defrauded a bank by submitting invoices for reimbursement of phantom credit card purchases through his company's bank account. 943 F.2d 798 (7th Cir. 1991). The court noted that the defendant's arrangement with the bank was the same as any other merchant with whom the bank contracted; there was nothing special about the relationship that made the bank more likely to trust the defendant than others. *Id.* at 800. Similarly, Mr. Rahbar was nothing more than "an ordinary merchant customer of the bank who committed fraud by abusing his contractual and commercial relationship with it." *Id.* No position of trust was exploited or needed to obtain the PPP loans.

Regarding the identity theft victim, the victim is an individual who provided her contact information and resume to BYNDfit co-founder Carl Pierre—not Mr. Rahbar—and expressed interest in a potential future position with BYNDfit, even touring the facility in a follow-up meeting. Mr. Pierre provided Mr. Rahbar with the information on her resume during the PPP loan application process, which Mr. Rahbar included in the BYNDfit Chinatown application. She had no meaningful interactions with Mr. Rahbar or any reason to trust Mr. Rahbar or Mr. Pierre with the information more than any other potential employer to whom she had provided her resume. Accordingly, the enhancement should not apply.

### 4. Acceptance of Responsibility under U.S.S.G. § 3E1.1(b).

It appears that the Government will not file a motion for an additional one-level decrease for Mr. Rahbar's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b), even though he has "clearly demonstrated acceptance of responsibility for the offense."[5] On information and

---

[5] PSR at ¶¶ 50, 68.

belief, the Government is not requesting the additional one-level decrease because Mr. Rahbar did not advise the Government of his intention to enter a guilty plea prior to the motions argument on February 26, 2025. This justification and the Government's refusal to file the motion are arbitrary.

Although the Government has the sole discretion to move for the additional one-level decrease, its decision not to file the motion cannot be arbitrary and must relate to defendant's failure to notify the Government sufficiently prior to trial such that permits the Government to avoid preparing for trial. U.S.S.G. § 3E1.1(b). Preparation for pretrial proceedings, such as motions arguments, or post-conviction matters, such as appeals, are not considered "preparing for trial," *id.* and refusals to file the motion on such grounds are arbitrary. *See, e.g., United States v. Divens*, 650 F.3d 343, 344 (4th Cir. 2011) (Government prohibited from withholding § 3E1.1(b) motion because the defendant has declined to perform some other act to assist the Government," such as waiving appeal); *United States v. Torres-Perez*, 777 F.3d 764, 768 (5th Cir. 2015) (error to withhold § 3E1.1(b) motion on basis of defendant's refuse to waive appeal); *United States v. Lee*, 653 F.3d 170 (2d Cir. 2011) (impermissible for government to withhold § 3E1.1(b) motion because defendant's objections to PSR required evidentiary hearing).

In early April, the Government advised Mr. Rahbar's counsel it would not file a motion for the additional one-level decrease, under § 3E1.1(b), as a matter of policy, because Mr. Rahbar had not agreed to plead guilty before the motions hearing in February. In making this assertion, the Government did not state that the timing of the plea caused it to expend resources preparing for trial. Prior to receiving this information, Mr. Rahbar's counsel was unaware of such policy and the denial of the additional level decrease was inconsistent with undersigned counsel's experience in this district, *see, e.g., United States v. Plowden*, 1:23-cr-00198-LMB (E.D. Va.) (government filed § 3E1.1(b) motion, despite defendant pleading guilty *after* original trial date passed), as well as in

other districts. *See United States v. Lynch*, 8:24-cr-0137-LKG (D. Md.) (defendant received additional one-level decrease under U.S.S.G. § 3E1.1(b), despite pleading guilty after plea agreement acceptance deadline passed).

Critical to the issue is the fact that the discovery in this matter is voluminous, consisting of hundreds of thousands of pages, and was initially provided to the Defense in a largely corrupted format that prevented review. Over the ensuing months Defense counsel devoted virtually all of their time attempting to review the voluminous discovery to meaningfully assess whether any viable defenses existed. Only after having reviewed most of the discovery, as well as tens of thousands of pages of materials provided by Mr. Rahbar, was counsel able to provide Mr. Rahbar with informed advice about the strength of the Government's case and the viability of any factual or legal defenses. Even at the time Mr. Rahbar entered his guilty plea, at least one production of promised discovery from the Government still remained outstanding. Had the Government advised Defense counsel that arguing motions vitiated a defendant's opportunity to receive an additional one-level guideline decrease, Defense counsel would have requested a continuance of the February 26, 2025 hearing in order to review the discovery or made alternative efforts to adjust strategy so Mr. Rahbar would not be harmed by the arbitrary policy. Thus, although the Government's refusal to file a motion for an additional one-level decrease for Mr. Rahbar's acceptance of responsibility is arbitrary standing alone, its failure to inform Defense counsel about this policy deprived Mr. Rahbar of critical information needed to make an informed decision about whether to plead guilty. Because Mr. Rahbar has clearly exhibited he accepts responsibility, and has expressed genuine remorse, he respectfully requests the Court order a one-level decrease, pursuant to U.S.S.G. § 3E1.1(b), or a downward variance commensurate with his sincere efforts to atone for his crimes.

10

### III.    NON-GUIDELINE CONSIDERATIONS UNDER 18 U.S.C. § 3553(a).

There is no presumption of reasonableness attached to the Sentencing Guidelines. *See Nelson v. United States*, 555 U.S. 350 (2009). Indeed, they serve only as a "starting point and initial benchmark" of a just sentence. *Gall v. United States*, 552 U.S. 38 (2007). The sentencing range established by the Guidelines is just one of many factors for this Court to consider. *See* 18 U.S.C. § 3553(a)(4). Thus, after ensuring the accuracy of Mr. Rahbar's Guidelines calculation, the analysis does not end. Rather, the Court must consider facts that would support any grounds to vary below the Guidelines. Variances must be considered separately from how the Guidelines would treat them if argued as departures, as every asserted departure also constitutes a basis for a variance. *See United States v. Booker*, 543 U.S. 220, 234-35 (2005); *see also Gall*, 552 U.S. at 38.

A just sentence for Mr. Rahbar, then, requires close consideration of multiple other § 3553(a) sentencing factors without special deference to the sentencing scheme established by the Guidelines. The Guidelines make up but one portion of the applicable statutory sentencing factors. U.S.C. § 3553(a)(4). The remaining statutory sentencing factors include: the nature and circumstances of the offense and the history and characteristics of the offender, § 3553(a)(1); the need to provide a sentence that is sufficient but not greater than necessary for purposes of punishment, deterrence, incapacitation, and rehabilitation, § 3553(a)(2); and the need to avoid unwarranted sentence disparities, § 3553(a)(6). These additional factors provide for mitigating features not adequately taken into consideration by the Guidelines while undercutting the rationale behind the imprisonment range produced by the Guidelines. Together, the statutory sentencing factors here support a variant sentence of thirty to thirty-six (30–36) months imprisonment.

### A.    Mr. Rahbar's History and Characteristics.

"Highly relevant, if not essential, to the selection of an appropriate sentence is the possession of the *fullest information possible* concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476, 476 (2011) (emphasis added). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Mr. Rahbar asks this Court to consider his offense in the full context of a lifetime of good citizenship and law-abiding behavior, as well as the situational stressors that converged on him just as he was attempting to open a multi-million dollar gym that he had financed largely with his own money, all leading to him engaging in behavior that was out of character.

### 1.    Background and Community Involvement.

Mr. Rahbar is the son of immigrant parents, Raymond Rahbar, Sr. (formerly Reza Rahbar), and Mary Barr (formerly Mahrou Rahemi), who fled the Iranian revolution during a civil war and the religious purges that ensued.[6] With no money or assets, the family struggled economically but benefitted from being part of a large community of immigrants who, like themselves, were finding their way in their new country.[7] This group, consisting of dozens of recent immigrant families, became the Rahbar's extended family and primary community.[8]

When Mary Barr arrived in the United States, she was already several months pregnant and soon gave birth to her only child, Raymond Rahbar. Mr. Rahbar's upbringing and value system was shaped by his immediate community as well as his parents who emphasized public service,

---

[6] PSR at ¶ 78; Ex. 1 at 1–2; Ex. 3 (Mary Barr Letter) at 1; Ex. 4 (Jamshid Mokkaber Letter) at 1; Ex. 5 (Carol Shakibnia Letter) at 1.
[7] Ex. 1 at 1; PSR at ¶ 78.
[8] Ex. 3 at 1; Ex. 6 (Borzou Azabdaftari Letter) at 1.

hard work, and personal accountability.[9] Both Mrs. Barr and Mr. Rahbar, Sr. finished their degrees in the United States, with him earning a Master's in Engineering from the University of Alabama, and her earning a Bachelor of Science in Computer Science in from Strayer University. Mr. Rahbar, Sr. eventually secured work as an engineer for the District of Columbia government where he served for nearly thirty-five years. When he retired, he ended his career as the Director of Tunnels and Bridges for the D.C. Department of Transportation.[10] Mrs. Barr worked most of her adult life at the Business Service Center, a small telecommunications company serving government contracts and public schools.[11]

Throughout his childhood, Mr. Rahbar's parents encouraged him to be compassionate towards those who are less fortunate and devoted to his friends and family.[12] Mr. Rahbar exhibited these values early on because, as the oldest and first American-born member of this immigrant community, he was considered the "eldest" son to all the other children born to his community of immigrants in the United States. As his surrogate uncle, Jamshid Mokkaber, recalls,

> Raymond grew up with no siblings. But because of our immigration to this country, we all raised each other's kids as our own and had one very large extended family. Raymond actually sacrificed and gave back more often than most. He was the oldest of all of the children. The first-born of a proud father. That role caused him to be a big brother whether he wanted to or not and whether he was ready to be or not. He took on that role his entire life and never looked back . . . [To this day h]e's the one that many of us call when our children need help.[13]

These values—community, compassion, and commitment to family and friends—describe Mr. Rahbar's lifelong value system and continue to this day.[14]

---

[9] Ex. 3 at 1.
[10] Id; PSR at ¶ 79.
[11] PSR at ¶ 78.
[12] Id.
[13] Ex. 4 at 1.
[14] Id.; Ex. 3 at 2; Ex. 6 at 2; Ex. 5 at 1; Ex. 1 at 4–5; Ex. 7 (Eric Raezer Letter), at 1–2, 6; Ex. 8 (Renee Mansfield Letter) at 1; Ex. 9 (Kyle Msawbah Letter) at 1; Ex. 10 (Jennifer Kidder Letter) at 1; Ex. 11 (Lisa Shelby Letter) at 1–2; Ex. 12 (Anna Deshong Letter) at 2, 4; Ex. 13 (Kathryn Dalby Letter) at 1; Ex. 14 (Max Masinter, Esq., Letter) at 1, 2; Ex. 15 (Laura Crist Letter) at 1, 2.

Mr. Rahbar attended public schools in Northern Virginia and went on to earn a bachelor's degree from George Mason University in Fairfax, Virginia, graduating in 2004. Thereafter he attended law school at Syracuse and Georgetown, earning a Juris Doctor from the latter in 2007. The following year he earned an L.L.M. from Georgetown.[15] Despite his legal training, Mr. Rahbar's true interests were entrepreneurial, and he set out to create companies built around innovative ideas that would attract non-traditional talent.[16] Jennifer Kidder, who worked for one of Mr. Rahbar's other startup companies before her employment with BYNDfit, describes the atmosphere he created:

> [N]early 1200 people have worked for Raymond in the last 10 to 15 years, but very few have ever quit. And the reason this list is so very short is that the environment, culture, comfort and trust Raymond has created is very authentic. The facts speak for themselves. It is so notable that people still talk about it. For many of us, it was the most exciting and rewarding times of our professional careers. There's a reason that about 75% of the people who worked in some capacity at BYNDfit or wanted to work there had also worked with Raymond at other ventures . . . The people who know Raymond best professionally all continue to want to work with and for him . . .[.][17]

By most measures, Mr. Rahbar was successful in making his entrepreneurial goals a reality as he built several startup companies from scratch that turned into lucrative businesses, employing hundreds of people for over a decade. Max Masinter, Esq., an attorney for the GPS Law Group who specializes in complex business transactions, has known Mr. Rahbar for nearly two decades and observed his ability to turn innovative ideas into tangible businesses:

> Raymond is a gifted entrepreneur who has built businesses that create jobs, foster communities and generate opportunities for others. As an attorney who has worked with many entrepreneurs, I can say with confidence that Raymond is unique in his ability to conceive and execute complex business ideas with vision and determination . . . The talent to build and inspire is rare . . .[18]

---

[15] PSR at ¶¶ 90–92.
[16] Ex. 3 at 1–2; Ex. 5 at 1–2; Ex. 10 at 1; Ex. 7 at 1; Ex. 13 at 1; Ex. 12 at 1–2; Ex. 14 at 1–2.
[17] Ex. 10 at 2
[18] Ex. 14 at 1.

Central to Mr. Rahbar's endeavors was a desire to provide opportunities for people based on merit and hard work. As the many letters in support attest, Mr. Rahbar created dynamic work environments that rewarded innovation and passion and encouraged growth in people both professionally and personally.[19] Mr. Rahbar was the kind of boss who took pride in his employees, was eager to give them credit for his success, and, in general, always sought to elevate them.[20] For example, Anna Deshong, who interned with Mr. Rahbar's company, recalls feeling "seen," valued, and welcomed by Mr. Rahbar, which promoted her personal and professional growth.[21] When Jennifer Kidder got a job that she believed she was not qualified to handle, she nevertheless flourished under Mr. Rahbar's guidance.[22] Eric Raezer acknowledges his own professional and personal development is largely predicated on the opportunities and support he received from Mr. Rahbar over the course of nearly 30 years, going from an unemployed graphic artist to becoming a successful father and highly valued professional consultant.[23] Simply put, Mr. Rahbar was the type of boss to shine "a spotlight on the people around him that contributed to his success, rather than take the full credit".[24]

It was from this character and drive that Mr. Rahbar dreamed about creating a cutting-edge, technologically advanced set of athletic facilities that were affordable and promoted holistic wellness. This dream became BYNDfit, and by early 2019, Mr. Rahbar had assembled a team of people who wanted to help him make that dream a reality. Although this dream was stymied by the COVID-19 epidemic, it is beyond dispute the business he created was real, that he had established a visionary business model with real employees and investment—from both himself

---

[19] Ex. 15 (Laura Crist Letter) at 1–2.
[20] *Id.* at 2.
[21] Ex. 12 at 2–3.
[22] Ex. 10 at 1–2.
[23] Ex. 7 at 3–5.
[24] Ex. 15 at 2.

and numerous investors—and that it had a great chance for success. This is essential context for Mr. Rahbar's subsequent actions and rationalizations as his dream rapidly disappeared and he was unable to soberly admit failure.[25]

### 2.    Mr. Rahbar Is a Good and Decent Man.

While it is easy to essentialize a person based on the worst thing they have ever done, especially when a serious crime is involved, giving in to that impulse would ignore Mr. Rahbar as a whole person and his lifetime of good works. Mr. Rahbar is far more than his offenses. The people who know him best and have assessed his character over decades affirm he is, and has always been, a good and decent man who has impacted many.

Mr. Rahbar is known as someone who gives whatever he has to his friends and family—financially, mentally, and emotionally—in ways that have meaningfully altered the trajectory of their lives.[26] Mr. Rahbar's friend, Eric Raezer, whom he has known since grade school, recalls becoming friends largely because they had opposite personalities. Where Mr. Rahbar was confident and outgoing, Mr. Raezer was shy and withdrawn. But it was the support Mr. Rahbar provided when Mr. Raezer decided to sue for custody of his daughter that showed him what an exemplary friend Mr. Rahbar is:

> Right away, there was Raymond not only providing moral support and talking me down off the edge, but using his background in law to help . . . Against all odds, after almost two years of difficult legal work with an excellent attorney, private investigators, anxiety, and practically all my money, I won my custody battle, and I brought my daughter home to Virginia at end of summer 2018 for her first school year here . . . This was to no small credit to Ray's advice, helping to push me to make one of the hardest but most positive and regret-free decisions of my life.[27]

---

[25] Ex. 1 at 2.
[26] *Id*. at 1–2; Ex. 3 at 1–2; Ex. 10 at 3; Ex. 7 at 3–4, 6; Ex. 11 at 2; Ex. 13 at 1; Ex. 12 at 1–2; Ex. 6 at 1.
[27] Ex. 7 at 3.

Mr. Raezer is one of many friends, family, and colleagues who wrote a letter to this Court providing similar examples of when Mr. Rahbar selflessly provided support to them and/or mutual acquaintances.[28]

Mr. Rahbar has admitted to committing fraud over a period of years by artificially inflating payroll figures and misrepresenting the number of employees for the purpose of obtaining loans. While Mr. Rahbar's lifetime of good works, devotion to friends and family, and general decency do not erase his crimes, these character traits provide essential ballast for a complete and accurate assessment of his character and the degree of punishment he has earned, as well as serve as the best indicator of his likely behavior in the future.

### 3. Mr. Rahbar Is a Generous and Charitable Person Who Has Positively Impacted Many Lives.

Since childhood, Mr. Rahbar has consistently exhibited selflessness in his acts of kindness and charity for friends, family members, employees, and anyone who comes into his orbit in need.[29] In these roles, Mr. Rahbar has shown consistent generosity to friends and strangers alike.

In school, Mr. Rahbar stood out for his willingness to help his peers succeed and was always generous with his resources. Even as a child, he looked after the other children at school and in his community of immigrants, reaching out and befriending peers to make them feel comfortable and accepted.[30]

During law school, Mr. Rahbar gave back in a more systemic and impactful way by teaching elementary school, for free, while shouldering a full academic load of his own:

> During law school, there was a local elementary school that was struggling to get accreditation – Mount Vernon Community School in Alexandria, Virginia. The teacher in that class had 28 students and rarely had more than 20 pass the

---

[28] Ex. 15 at 2–3; Ex. 3 at 1–2; Ex. 10 at 3; Ex. 7 at 1; Ex. 11 at 1, 2; Ex. 13 at 1; Ex. 13 at 2–3; Ex. 6 at 1.
[29] Ex. 3 at 1; Ex. 6 at 1; Ex. 5 at 1; Ex. 7 at 3–4, 6; Ex. 8 at 1; Ex. 9 at 1; Ex. 10 at 1; Ex. 11 at 2; Ex. 12 at 1–2; Ex. 13 at 1; Ex. 14 at 1, 2; Ex. 8 at 1; Ex. 10 at 3.
[30] Ex. 7 at 1.

> standardized tests that students are required to take at the end of their 5[th] grade year. Raymond heard about this and did what he did best. He partnered his undergraduate alma mater University, and offered to teach for free to give these kids a chance. He taught math and science to fifth graders for two years . . . The reason he partnered with George Mason was so that he could teach for free under a state program and the school didn't have to use its limited resources on salary.[31]

Many of Mr. Rahbar's long-term friends have experienced his generosity and kindness across the seasons of their lives, including Renee Mansfield who met Mr. Rahbar in college and immediately observed him to be a person "with a generous heart, a natural defender of others, and a protector who never allows those around him to feel 'less than.'"[32] Similarly, friend and colleague Jennifer Kidder recalls the crisis that enveloped her life during the pandemic and the central role Mr. Rahbar played in helping her persevere:

> Raymond had a million and one things to keep track of in the early days of the pandemic. Everyone was angry at the gym shutting down . . . But guess who reached out to make sure I was mentally ok during that time? Raymond. I told him I was really struggling, and he came over to help with my kids one day. I told him I had to withdraw my four boys from school because I couldn't afford to buy 4 new computers and upgrade the home Wi-Fi without any income. It was an embarrassing admission to make to your boss who himself had just lost everything he had . . . [Raymond] worked with a few vendors he knew and had 4 computers donated so that my kids could attend all their classes virtually.[33]

Mr. Rahbar is known for being dependable even when he himself is suffering. Shortly after his own father's untimely death and the suicides of two close friends, Mr. Rahbar:

> [f]ound time to help his friends, family, and others. He helped Carl Pierre's mother through a stalker situation, he helped [a mutual friend] when he was suicidal after being diagnosed with brain cancer, he continued to teach – for free – Entrepreneurship at George Mason University, helped one gym employee when her ex-husband left her stranded . . . helped approximately 10 employees find new jobs by writing recommendation letters and networking for them . . . During the height of the Covid-19 pandemic, Raymond gave all his suits to charity for those that are less fortunate to have suits for interviews.[34]

---

[31] Ex. 14 at 1.
[32] Ex. 8 at 1.
[33] Ex. 10 at 3.
[34] Ex. 6 at 1–2; *see also* Ex. 7 at 6 ("I've seen Raymond do countless objectively positive things in his life … charity, employing friends, emotional support for his loved ones during times of terminal illness diagnosis or familial suicides,

Generosity, charity and giving back to the community have been touchstones of Mr. Rahbar's first forty-three years, and will continue for the remainder of this life.[35] Indeed, as he explains in his letter to this Court, Mr. Rahbar views this prosecution as a wakeup call for him to reset his life after falling badly off course and gravitating away from his core values:

> I do not pretend that words are enough. Because of that, I have accepted responsibility, admitted my guilt, and prepared myself to accept whatever punishment that Your Honor deems fair. But I also know that long after this case is over, I will be left to pick up the wreckage of my life and what remains. I have been doing that for several years, but I know I have a lot of work to do. I plan to use this experience—and particularly my course corrections—and whatever sentence you impose as a turning point in my life.[36]

Mr. Rahbar's friends and family relied on him, and his overwhelming fear of failing them—and losing everything—contributed mightily to his poor decisions. However, his actions stemmed not from greed, but rather from panic and a desperate need to maintain the appearance of success amid mounting personal and professional crises.

### 4.    The Offense Conduct Was Out of Character.

Mr. Rahbar did not go from being a law-abiding citizen to someone desperate enough to commit fraud overnight. It took a series of unique stressors in 2019–2020 under which Mr. Rahbar eventually buckled. In 2019 and 2019, Mr. Rahbar worked to secure financing, contracts, employees, equipment, and programming content for BYNDfit, dedicating much of his personal finances to support the vision. But when Mr. Rahbar, Sr. died unexpectedly in April 2019, Mr. Rahbar became his mother's primary financial and emotional support. He made all the arrangements for his father's funeral. He took responsibility for settling his father's affairs,

---

financially supporting his mother and friends, like myself.… I can say with absolute assuredness … that he's *at least* helped save *one friend's* life and the life of his friend's daughter.") (emphasis in original).
[35] Ex. 1 at 4.
[36] *Id.*

including attempting to save two construction companies his father had founded. And he successfully prosecuted a wrongful death action on his mother's behalf. Shortly after his father's death, Mr. Rahbar suffered additional tragedies when two close friends committed suicide.[37] Nevertheless, he continued to push forward with the BYNDfit venture and support his late father's business until the COVID-19 pandemic.

Any one of these experiences would have been challenging and stressful, but when they converged, Mr. Rahbar was woefully unprepared. The lack of control undermined his identity as a successful business man and reliable friend that could always move forward and tackle any obstacle.[38] Rather than seek help, recalibrate, or be honest with investors and employees counting on him, Mr. Rahbar redoubled his efforts to make BYNDfit a success and, in the process, became financially and emotionally overcommitted.[39] When his company began to implode during the first months of the pandemic, he let his pride and desperation justify committing the crimes for which he now claims accountability.[40]

Eric Raezer, observed that the budding realization of BYNDfit's doom broke something in his friend:

> For the first time I saw Raymond exhibit real desperation. In retrospect it is clear to me that Raymond was in survival mode, not confident or sure of himself. He was literally scrambling to keep his head above water - not knowing the future and how he was going to support himself or his mother in the vacuum left in the wake of his dad's sudden passing. Sometimes, I didn't recognize this formerly confident person I'd leaned on over and over for 30 years . . .[41]

The slow collapse of his business dealt a deep blow to Mr. Rahbar's sense of identity. Mr. Rahbar's close friend Laura Crist describes this experience:

---

[37] Ex. 7 at 4; Ex. 8 at 1.
[38] Ex. 15 at 3; Ex. 1 at 3–4; Ex. 11 at 2; Ex. 5 at 1; Ex. 7 at 1, 3–4; Ex. 13 at 1; Ex. 3 at 1–2; Ex. 12 at 1-2.
[39] Ex. 1 at 1; Ex. 7 at 4, 5.
[40] Ex. 15 at 2; Ex. 11 at 2; Ex. 5 at 1; Ex. 1 at 1–2, 3; Ex. 7 at 4, 5; Ex. 13 at 1; Ex. 3 at 1, 2; Ex. 4 at 1; Ex. 9 at 1.
[41] Ex. 7 at 6.

> It is painful for me to even fathom how demoralizing it was to, one moment, be anticipating the grand open of the project [Raymond] had poured his heart and soul into, and the next be grappling with the uncertainty of COVID. [I] watched helplessly as he retreated into an uncharacteristically dark, lonely, and depressive state.[42]

Mr. Rahbar's offense conduct, although very serious, does not reflect his true character. Instead, it is evidence of the depression, desperation, and anxiety he was experiencing, which culminated in impaired judgement.[43] The circumstances that contributed to Mr. Rahbar's anomalous conduct were an aberration that will never reoccur. His offense and the desperate attempt to salvage his company are not the product of a criminal mind, but rather indicative of situational impairments and instability. *See United States v. DeRuse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (finding no abuse of discretion for district court to find defendant "was entitled to a downward variance based on aberrational nature of conduct" under 18 U.S.C. § 3553(a), even if it failed to meet requirements of U.S.S.G. § 5K2.20, because it represented "a marked deviation by the defendant from an otherwise law-abiding life").

### 5.    Mr. Rahbar is Genuinely Remorseful.

In addition to formally accepting responsibility for his crimes and the certain punishment that will follow, Mr. Rahbar is also genuinely remorseful for his actions and the harms he has caused to institutions and the people who trusted him, including his family, friends, investors, and even the people whom he never met:

> It is very clear to me now that dishonesty and cutting corners not only fails in the long run, but it leaves scars that outlast any perceived gain I used to rationalize my actions. I was deep in a hole in 2020 having committed all of my resources to this business, and instead of recalibrating when my father died, I dug the hole deeper and deeper until it consumed me. In digging that hole deeper, I hurt and humiliated many good people, I destroyed my father's name, I hurt my friends, and I disappointed my community.[44]

---

[42] Ex. 15 at 3.
[43] *Id.* at 2–3; Ex. 6 at 1; Ex. 7 at 4–5; Ex. 13 at 1; Ex. 11 at 2; Ex. 3 at 2.
[44] Ex. 1 at 5.

Although Mr. Rahbar's guilty plea was the first public expression of remorse, he has been making private apologies for a long time to atone to people who he deceived and harmed.[45] Mr. Rahbar's good friend, Kathryn Dalby, describes Mr. Rahbar's efforts to atone this way:

> Raymond has openly acknowledged the seriousness of his offense and expressed genuine remorse. In our conversations he has never minimized what he did; instead, he has focused on how he can take responsibility and build a better future . . . He has stepped away from the fast paced entrepreneurial life, prioritized his family, and sought to contribute in positive ways.[46]

Mr. Rahbar's statement and efforts to make amends are not merely words. They are backed up by decisive actions and irreversible consequences. He has admitted to two crimes which will require him to spend years of his life in prison. He will be required to pay millions in restitution and has agreed to forfeit assets. He will lose his freedom. When Mr. Rahbar is released from prison, it will be as a felon. He acknowledges he irreparably harmed specific people whom he cares for and who trusted him, making their friendships unsalvageable. He acknowledges he let down dozens, if not hundreds, of people by his actions.

Although the lack of remorse is more commonly cited as a reason for an upward variance, *United States v. Rios-Rivera*, 913 F.3d 38, 46 (1st Cir. 2019); *United States v. Davis*, 458 F.3d 491, 499 (6th Cir. 2006), *vacated on other grounds by Gall v. United States*, 552 U.S. 38 (2007), sincere expressions of remorse are an accepted basis for varying downward, even for serious crimes. *See, e.g., United States v. Beach*, 275 F. App'x. 529, 532-33 (6th Cir. 2008) (district court did not exceed discretion in imposing 96-month sentence varying downward from Guidelines range of 210-240 months for violation of 18 U.S.C. § 2252(a)(1) based in part on defendant's remorse); *United States v. Taylor*, 2022 U.S. Dist. LEXIS 86082, *13 (S.D. W.Va. 2022) ("Court

---

[45] Ex. 1 at 1, 3, 4; Ex. 3 at 3; Ex. 13 at 1–2; Ex. 10 at 3–4; Ex. 7 at 5; Ex. 8 at 2; Ex. 15 at 3, 4; Ex. 11 at 2.
[46] Ex. 13 at 1–2.

recognized the Defendant's sincere remorse and family obligations in granting downward variance" in heroin distribution case); *United States v. Johnson*, 2021 U.S. Dist. LEXIS 34217, *2-3 (W.D. Pa. 2021) (court credits defendant's early acceptance of responsibility and remorse in granting downward variance); *United States v. Bleicher*, 2020 U.S. Dist. LEXIS 92027, *9 (D. N.J. 2020) (noting defendant's "genuine remorse" supported a significant downward variance of for defendant who pleaded guilty). Mr. Rahbar's acceptance or responsibility, sincere remorse, and exemplary adjustment to pretrial supervision augur for a variant sentence.[47]

As discussed herein, Mr. Rahbar clearly accepted responsibility for his offense and the Government's failure to file a motion for an additional level departure pursuant to U.S.S.G. § 3E1.1(b), is arbitrary. *See* Point II.B.4, *infra* at 8–10. If the Court rejects that claim, Mr. Rahbar requests that the Court nonetheless grant a variance based on his clear acceptance of responsibility and genuine remorse.

### 6.    Mr. Rahbar Lacks a Prior Criminal Record.

Prior to arrest on the instant offense, Mr. Rahbar had no prior criminal record. The absence of a significant prior criminal history is both a good indicator of Mr. Rahbar's true character and a strong protective factor for non-recidivism. *See United States v. Huckins*, 529 F.3d 1312, 1318–19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"); *United States v. Darway,* F. App'x. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first offender status); *United States v. Smith*, 2008 WL 1816564, *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history); *United*

---

[47] PSR at ¶ 12–13.

*States v. Urbina*, 2009 U.S. Dist. LEXIS 18239, *6 (E.D. Wis. 2009) (considering low risk of recidivism indicated by defendant's lack of a criminal record, positive work history and strong family ties).

Also, because Mr. Rahbar has never previously been incarcerated for a criminal offense, imprisonment will mean far more to him "than to a defendant who previously has been imprisoned [and c]onsideration of this factor is consistent with § 3553's directive that the sentence reflects the need for 'just punishment,' § 3553(a)(2)(A), and 'adequate deterrence.'" *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006); *see United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend."). Accordingly, the absence of a prior criminal record or history of incarceration strongly supports a variant sentence in this case.

### 7.    Mr. Rahbar Has a Strong Community of Support.

Long before being charged, Mr. Rahbar developed a positive locus of support in his community. He has dozens of supportive friends who have stood by him during these proceedings because they understand his offense is out of character. Mr. Rahbar has grown closer to his mother over the ensuing time. Critically, admitting his crimes and taking responsibility has infused Mr. Rahbar's close relationships with greater honesty and openness.[48] These changes are welcomed by his friends and family who now experience Mr. Rahbar as more grounded and open. Since his arrest, Mr. Rahbar has poured himself into these meaningful relationships, as the numerous letters appended to this memorandum demonstrate. Strong communities of support have long been recognized as an appropriate basis for a variant sentence because they are the most important buffer

---

[48] Ex. 1 at 1, 3; Ex. 3 at 2–3; Ex. 13 at 1; Ex. 10 at 3; Ex. 7 at 5; Ex. 8 at 2; Ex. 15 at 3, 4; Ex. 11 at 2.

against re-offense. *See United States v. Martin*, 520 F.3d 87, 90 (1st Cir. 2008) (affirming 91-month variance based in part on support defendant stood to receive "from his family [and] personal qualities indicating his potential for rehabilitation"); *see also United States v. Stall*, 581 F.3d 276, 288-89 (6th Cir. 2009) (affirming substantial variance based in part on remorse and substantial and family support); *Urbina*, 2009 U.S. Dist. LEXIS 18239, at *6.

### B.    The Nature and Circumstances of the Offense.

The nature and circumstances of the offenses warrant a variant sentence. Unlike most PPP loan fraud cases, Mr. Rahbar applied for these loans in a desperate attempt to save the startup business into which he had poured his dreams and capital. Mr. Rahbar acknowledges there is no excuse for his conduct. While no amount of good intentions justify or erase the crimes for which he now accepts responsibility, the context in which Mr. Rahbar committed these crimes demonstrates why the Guidelines calculation greatly overstates an appropriate sentence range in this case.

In 2018, Mr. Rahbar began laying the groundwork for a dream startup business, BYNDfit: an "all-in-one" fitness brand that would provide not only traditional gym services, but also virtual reality workouts and cycling classes, individual exercise studios, and high-end amenities. Mr. Rahbar selected a property across from the Capital One Arena and Chinatown Metro stop in downtown Washington, D.C. as the inaugural location and signed a lease in November 2018 ("BF Chinatown"). Throughout 2019, Mr. Rahbar worked tirelessly to renovate the space to fit his vision. He and his team hired contractors to create custom features and structures, leased gym equipment, and worked with engineers to create a custom IMAX-style screen for virtual cycling classes. Mr. Rahbar invested in BYNDfit branded merchandise and marketing materials like website content, an Instagram account that launched in September 2019, t-shirts, and promotional

materials. He also established a senior management team of industry leaders that would create and manage custom class programming and help identify potential full- and part-time trainers to support the gym's needs.

During these renovations, in April 2019, Mr. Rahbar's father passed unexpectedly. As an only child, in the wake of his death, Mr. Rahbar was forced to take on his father's home renovation business, including its loans, debts, and operations. Saddled with grief and an overwhelming amount of responsibility, Mr. Rahbar chose to ignore the reality of his new circumstances and resolved to make the BYNDfit business a success.

In late 2019 and early 2020, the management team focused on attracting the best fitness industry talent across a variety of exercise practices. Mr. Pierre attended several student job fairs to garner interest in internships and part-time positions for local students, collecting resumes for potential candidates. BYNDfit management team members conducted instructor auditions and site tours, identifying a group of individuals that could begin teaching classes when the Chinatown location opened its doors. They also began to offer early membership deals to acquaintances and other interested individuals and conducted multiple "beta" classes for the virtual reality workouts.

BF Chinatown was intended to be the first of many BYNDfit facilities nationwide. While renovating the BF Chinatown gym space in 2019, Mr. Rahbar sought a property for a second location in Washington, D.C. After several test fits, Mr. Rahbar put down a deposit to secure the lease on a location in the Georgetown neighborhood ("BF Georgetown"). Mr. Rahbar expected that several of the BF Chinatown management team members would occupy similar roles at the Georgetown location after the flagship gym was up and running.

Mr. Rahbar originally planned to open BF Chinatown in late 2019. But successive construction delays pushed back the anticipated opening date to April 2020. In March of 2020, just

as Mr. Rahbar was preparing to open the gym, the COVID-19 pandemic struck. All gyms and fitness centers were immediately subject to government-mandated closures, abruptly halting their plans and forcing the business into an indefinite limbo.

As Mr. Rahbar and his team waited for the world to return to normalcy, Mr. Rahbar began to panic. He had spent years pouring time, resources, and hope into this startup dream that was so close to being realized. In a desperate effort to keep the incipient BYNDfit businesses afloat, pay bills, and retain management and instructor talent, Mr. Rahbar submitted PPP loan applications that inflated the number of employees working for the businesses in the first quarter of 2020. In so doing, he included legitimate employees as well as prospective employees and contractors, using the estimated headcount and salaries as an approximation of the anticipated size of the businesses. Mr. Rahbar did the same for the entities associated with the business his father left behind when he died the year prior.

Mr. Rahbar knew that some of the individuals in the applications should not have been included in the salary calculations and wrongly told himself that the ends justified the means. He believed that the end of the pandemic was just around the corner, that BF Chinatown would open its doors, and that the expansion to BF Georgetown could proceed. In trying to hold onto this belief, Mr. Rahbar made a series of terrible choices.

As months passed, Mr. Rahbar continued to push for an eventual gym opening. After receiving the PPP loan proceeds, Mr. Rahbar did not spend the money on a lavish lifestyle. Much of the funds were used to prop up his dying business: for example, he paid utilities and equipment leases and sent money to individuals who were employed or who performed significant amounts of work for BYNDfit without employment contracts in early 2020.[49]

---

[49] Contrary to the statements in the PSR, Mr. Rahbar did not ask a majority of these individuals to return the funds he provided to them. Mr. Pierre and Mr. Macaulay reinvested some of the PPP loan money they received back into the

By 2021, Mr. Rahbar feared that BYNDfit would never recover. But the release of the COVID-19 vaccine renewed his hope that his startup could finally open its doors to the public. Mr. Rahbar again applied for PPP loans using an inflated number of employees, allowing his desire to save his startup to justify what he knew was wrong.

Mr. Rahbar made a series of bad choices that were exacerbated by the impact of the COVID-19 pandemic and the financial strains his father's recent death had on his family's construction business. While unquestionably wrong, Mr. Rahbar's actions were, in large measure, intended to alleviate the burden the pandemic placed on him and his businesses, not to exploit it.

Nor did he steal individuals' social security numbers or sensitive information to assume their identity or cause them financial harm. These individuals provided their resumes to Mr. Pierre in hopes of potentially working or interning at the gym. Discovery provided to Mr. Rahbar by the Government indicates that some of these individuals even interviewed or scheduled interviews with Mr. Pierre for these positions. Mr. Pierre gave these names and resume information to Mr. Rahbar, which Mr. Rahbar then included in the BF Chinatown application.

No amount of financial burden or personal loss justifies Mr. Rahbar's decisions, and he has pled guilty and accepted responsibility for his actions. But the circumstances surrounding his crime, and the stark contrast between this and the typical PPP loan fraud and aggravated identity theft case, justify a substantial departure from a Guidelines sentence.

---

business as co-owners of the startup. When interviewed, Ms. Macaulay did not state that Mr. Rahbar asked her to return any of the money she received. Ms. Partlow and Mr. Pierre's brother, Paul, were never interviewed. To undersigned counsel's knowledge, none of the other individuals interviewed by the Government stated that they were asked to return PPP loan funds to Mr. Rahbar.

### C.    Deterrence and the Need to Protect the Public from Future Crimes of the Defendant.

Mr. Rahbar is at low risk to reoffend based on available empirical evidence and relevant factors. Given his background, education, current age, age at the time of his offense, lack of a prior criminal history, exemplary adjustment to pretrial supervision, significant community support, and the length of time since the offense, the likelihood of Mr. Rahbar committing future crimes is nil. *See, e.g.*, Michael Massoglia and Christopher Uggen, *Settling Down and Aging Out: Toward an Interactionist Theory of Desistance and the Transition to Adulthood*, Am. J. Soc., 116(2), at 543-82 (Sept. 1, 2010). Mr. Rahbar's exceedingly low risk of re-offense, standing alone, supports a significant downward variance. *See United States v. Cherry*, 487 F.3d 366, 370-72 (6th Cir. 2007) (upholding 43% downward variance because defendant had a "low risk of reoffending"). According to the United States Sentencing Commission, a male Criminal History Category I offender over 41 years of age, like Mr. Rahbar, has an historical general recidivism rate of 6.9% which is the second lowest rate in the Commission's study.[50] The general recidivism rates coupled with Mr. Rahbar's history and personal characteristics—particularly his level of education, exemplary work history, and lack of illicit drug use—pushes that rate even lower, leaving little doubt that he is not at risk of recidivism and strongly militating in favor of a substantial variance from the advisory Guideline range.[51]

While this Court must consider general deterrence under § 3553(a), no evidence supports the finding that a harsh sentence serves to deter future criminal conduct. The particular combination of motivations (depression and desperation in this case), and unique circumstances (a

---

[50] U.S.S.C. Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 28, Ex. 9 (May 2004) (listing recidivism rates for various types of offenders and considering such demographics such as gender, age, race, drug use, level of education, etc.), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.
[51] *Id*. at 29.

failing business and global pandemic) which led an otherwise law-abiding citizen to risk imprisonment are not addressed or corrected by simply imposing a long prison sentence. In reality, it is the *certainty* of punishment rather than the *severity* of the punishment which acts as a deterrent.[52] Relatedly, there must be some limit to the need for a single person to bear the full weight of general deterrence. *See United States v. Meyers*, 353 F. Supp. 2d 1026, 1029 n.1 (S.D. Iowa 2005) ("the weight of society's need to send a message to potential wrongdoers can only be borne to a limited extent by one individual."); Paul H. Robinson, *Distributive Principles of Criminal Law*, at 223 (2008) (noting potential ethical objection to overemphasis on general deterrence, which "relies on treating the person being punished as a mere instrument by which to influence the conduct of others").

For all the reasons discussed throughout this memorandum, the sentence recommended in this case serves an appropriate deterrent for those who would consider engaging in conduct similar to the offenses Mr. Rahbar has committed.

### D.    Seriousness of Offense, Respect for the Law, and Just Punishment.

Mr. Rahbar has acknowledged the seriousness of his offense, both publicly and privately, and that his actions will have significant, severe consequences including the loss of his freedom, hefty restitution and forfeiture obligations, and a felony conviction. The requested total sentence

---

[52] *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence"); *id.* ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 9 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); Symposium, U.S.S.C, Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, *What Social Science can Contribute to Sentencing Policy for Economic Crimes*, at 22 (Oct. 12, 2000) ("One Consistent finding in the deterrent literature is that the certainty rather than the severity of punishment is the most effective deterrent."), *available at* https://www.ussc.gov/research/research-and-publications/research-projects-and-surveys/united-states-sentencing-commissionsymposium-federal-sentencing-policy-economic-crimes-and-new; *see also* Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (according to "the best available evidence … prisons do not reduce recidivism more than noncustodial sanctions").

of between thirty and thirty-six (30–36) months imprisonment sufficiently accounts for this important sentencing consideration, promotes respect for the law, and constitutes just punishment under the circumstances of this case. For the reasons discussed in the disparity analysis below, the requested sentence will provide sufficient punishment for Mr. Rahbar's offenses as balanced against other sentences recently imposed in relatively similar cases—albeit more glaringly egregious—and when all other factors are taken into account.

###   E.    Need to Avoid Unwarranted Sentencing Disparities.

"Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity." *Booker*, 543 U.S. at 254. That goal is reflected in 18 U.S.C. § 3553(a)(6)'s command for district courts to consider the need to avoid unwarranted sentencing disparities among "defendants with similar records who have been found guilty of similar conduct. Consideration of the sentences imposed on defendants in similar cases has two components in this case. First, we request the Court consider sentences imposed in numerous PPP loan fraud cases in this district involving defendants who were significantly more culpable than Mr. Rahbar yet received sentences well below his Guidelines calculation. Second, we request that the Court consider the arbitrariness of imposing a mandatory minimum sentence for aggravated identity theft based solely on a recent change in policy that was not shared with the Defense and ran contrary to Defense counsel's more than forty years of collective experience in this district. These considerations demonstrate that the imposition of a total sentence between thirty and thirty-six (30–36) months imprisonment and will avoid an unwarranted sentence disparity.

1.    **PPP Loan Fraud Cases in This District.**

a.    *United States v. Rudin*, **1:22-cr-00046-AJT.**

Just after serving five years for his commission of a previous massive fraud scheme, which resulted in a restitution judgment of $39,943,267.71, Rudin conceived of a tax fraud scheme by which he filed false tax returns for professional athletes that reported fabricated business losses and other false items to support large tax returns from the IRS to which they were not entitled, resulting in over $19,000,000 in loss to the government. (*Rudin*, Dkt. 54 at 1–2, 4–5). Rudin collected 30% of the illegal refunds he obtained through his conspiracy. Rudin used his same company, Mana Tax, to file approximately 80 fraudulent PPP loan applications that resulted in a **loss amount of $43,810,330**, of which he took another 30%. *Id.* at 4–5. These crimes occurred while Rudin was on supervised release from his prior criminal offense, which included filing dozens of fabricated tax returns and lying to his probation officer to avoid detection of the crimes at issue during sentencing. *Id.* at 3, 5–6.

Based on Rudin's criminal history category III and combined *actual* loss amount in excess of $60,000,000, the United States Probation office calculated a **guideline sentencing range of 151-188 months** imprisonment but recommended a higher guideline range of 168–210 months. This included a three-level enhancement under U.S.S.G. §3B1.1(b) for his role as the manager/supervisor and sole decision-making authority for the scheme. (*Rudin*, Dkt. 54 at 10, 14). For each of the separate criminal conspiracies, the district court imposed a total sentence of 120 months, consisting of two consecutive 60-month terms of imprisonment. (*Rudin*, Dkt. 63 at 2). Thus, for his role in a nearly **$44 million** PPP loan fraud scheme, in which **he personally collected nearly $4 million** (*Rudin*, Dkt. 54 at 7), Rudin received a sentence of **60 months** imprisonment.

### b.     *United States v. Rosenburg*, 1:24-cr-00061-CMH.

Clayton Rosenburg conspired with others to secure sixteen fraudulent PPP loans and collect unemployment insurance benefits to which he was not entitled, and his crimes resulted in a loss of **at least $9.4 million** dollars. (*Rosenburg*, Dkt. 20 at 1, 3). To support his multiple fraudulent loans, Rosenburg and his coconspirators lied about the number of employees and payroll cost for multiple businesses and created fake tax documents and bank statements to support the fraudulent loan applications. *Id*. at 2 (citing PSR ¶ 25). Once the PPP loans were disbursed, the defendant and his coconspirators charged the businesses large fees. *Id.* Of the 9.4 million stolen, Rosenburg personally received **at least $1.6 million**, or about 18% of the total amount. *Id.* at 3.

In addition to an eighteen-level enhancement for loss between $3.5 and $9.5 million, U.S.S.G. §2B1.1(b)(1)(J), a two-level enhancement for deriving more than $1 million in gross receipts from a financial institution, U.S.S.G. §2B1.1(b)(17)(A), and a two-level enhancement for use of sophisticated means, U.S.S.G. §2B1.1(b)(10)(C), the probation office also recommended a two-level enhancement for Rosenburg's use of device making equipment/authentication features pursuant to U.S.S.G. §2B1.1(b)(11)(4). (*Rosenburg*, Dkt. 20 at 4–6). Despite his protracted and flagrant conduct, and the large amount of money defrauded, Rosenburg received a sentence of only **63 months imprisonment**.

### c.     *United States v. Magee*, 1:23-cr-00091-CMH.

Bennie Magee concocted a scheme to defraud the United States and lending institutions of **over $7 million** in pandemic relief funds under both the PPP and Economic Injury Disaster Loan Program (EIDL). (*Magee*, Dkt. 16 at 2). Magee then used the fraudulently secured proceeds to invest in crypto currency speculation (which he mostly lost), luxury vehicles, and other vanity projects. *Id.* Magee carried out his scheme by enlisting unsophisticated family members and

friends to fill out false loan applications, fabricate tax returns, make up payroll records, and create falsified profit/loss statements for non-existent businesses. *Id.* Through his scheme Magee personally **obtained $5 million** and over $7 million total. *Id.* at 3.

Based on Magee's conduct, which included a +18 enhancement for total loss amount exceeding $3.5 million, U.S.S.G. §2B1.1(b)(J), a two-level enhancement for receiving more than $1 million in gross receipts from a financial institution, U.S.S.G. §2B1.1(b)(17)(A), a two-level enhancement for use of sophisticated means, U.S.S.G. §2B1.1(b)(10)(C), a two-level enhancement for his role as leader/organizer, U.S.S.G. §3B1.1(a), a two-level enhancement for obstruction of justice to thwart an FBI investigation, U.S.S.G. §3C1.1(b), a criminal history of I, and failure to accept responsibility for his crimes, the probation office calculated the defendant's adjusted offense level to be 35, and recommended a sentencing guideline range of 168–210 months. However, while the Government did not disagree with the reasonableness of probation officer's denial of acceptance of responsibility in light of its assessment that Magee's obstruction of justice (*Magee*, Dkt. 16 at 8), it nonetheless recommended a three-level reduction, pursuant to U.S.S.G. § 3E1.1(a) & (b), resulting in an adjusted offense level of 32, and a **guideline sentencing range of 121–151 months** imprisonment. At sentencing, the district court imposed a total sentence of **60 months** imprisonment. (*Magee*, Dkt. 23 at 2).

### d.    *United States v. Ouedraogo*, 1:23-cr-00183-CMH.

From at least June 2020 through at least June 2021, Ouedraogo and his coconspirators submitted applications to financial institutions for PPP loans on behalf of various businesses, and created fake tax documents and bank statements to support the fraudulent loan applications. (*Ouedraogo*, Dkt. 17 at 2). In total, Ouedraogo and his coconspirators prepared at least 16 fraudulent PPP loan applications, resulting in a **loss amount of $9,364,894**. Ouedraogo's personal

profit from the conspiracy was **$384,700**. (*Ouedraogo*, Dkt. 17 at 3). During the eight years before he committed the PPP loan fraud, Ouedraogo was a serial fraudster and engaged in a variety of other criminal schemes, including fraudulently purchasing or attempting to purchase multiple luxury cars in 2016, using altered and re-embossed debit cards stolen from a guests at a pool club in 2017, and committing an extended mail fraud scheme involving stolen insurance checks and aggravated identity theft in Minnesota in from 2022 to 2023. *Id.* at 7. For the latter offense, the defendant was set to be sentenced *after* his sentencing in this district, so his crimes could not be used in the calculation of his criminal history category. *Id.* at 7–8.

Based on Ouedraogo's offense conduct, the probation office recommended an eighteen-level enhancement for total loss amount between $3.5 and $9.5 million, U.S.S.G. §2B1.1(b)(J), a two-level enhancement for receiving more than $1 million in gross receipts from a financial institution, U.S.S.G. §2B1.1(b)(17)(A), and a two-level enhancement for using of sophisticated means, U.S.S.G. §2B1.1(b)(10)(C). Based on unique mitigation circumstances from Ouedraogo's background, contained in a sealed pleading, the Government recommended a substantially below-Guidelines sentence of 56-months imprisonment, and the district court went even further, ordering him to serve **36 months imprisonment**. (*Ouedraogo*, Dkt. 17at 1, 9; *Ouedraogo*, Dkt. 22 at 2).

### e.    Comparable Cases Demonstrate the Appropriateness of a Downward Variance in This Case.

Each of these comparable cases involved far more egregious conduct. All of the four defendants—Rudin, Rosenberg, Magee, and Ouedraogo—committed more serious offenses, stole significantly more money, and caused far more economic harm than Mr. Rahbar. The amounts these defendants stole while committing fraud were between two and eleven times more than the loss amount in this case. Likewise, all but one of these defendants personally received far more money than Mr. Rahbar, ranging between $1.6 million (Rosenberg), $4 million (Rudin), and $5

million (Magee). Two of these defendants (Rudin and Ouedraogo) had previously engaged in substantial prior fraud crimes, and Rudin was on supervised release at the time he committed the PPP loan fraud. A third defendant (Magee) engaged in additional criminality by obstructing justice during FBI investigation in an effort to avoid detection. Three of the defendants (Magee, Rosenberg, Ouedraogo), used sophisticated means to carry out and hide their offenses. By any metric, each of these offenders committed far more serious crimes and were more culpable than Mr. Rahbar, yet their average sentence was **54.75 months** imprisonment. The only offender who arguably received any benefit close to the amount received by Mr. Rahbar, Ouedraogo, was sentenced to of 36 months imprisonment which, in this case, would be sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2). But even Ouedraogo is more culpable than Mr. Rahbar given Ouedraogo's long history of criminal behavior, blatant disregard for the law, and the total amount he stole.

Perhaps the comparison between Mr. Rahbar's case and the *Rudin* prosecution best illustrates the limitations of the Sentencing Guidelines. Rudin's offense conduct was unquestionably more widespread, serious, harmful, and began almost immediately after his release from a five-year sentence for fraud charges. Although Rudin was clearly motivated by greed during his decade-long crime spree, he received a sentence of approximately one-half the advisory Guidelines range for his PPP loan fraud—a total of 60 months. In contrast, Mr. Rahbar's conduct primarily, at least initially, emanated from a misdirected effort to save his business, he benefitted little by comparison, and caused one-tenth of the loss caused by Rudin. Critically, this conduct represents Mr. Rahbar's first criminal offense. Despite these significant differences, the probation office has recommended a Guidelines range for Mr. Rahbar that is more than double the sentence imposed in *Rudin*. No reasonable person comparing the facts of these two cases would suggest

they deserve a similar sentence. Thus, if Congress's directive to avoid unwarranted sentence disparities is to mean anything, Mr. Rahbar's sentence should be significantly less than the sentence imposed on Rudin in order to comply with 18 U.S.C. § 3553(a)(6).

## 2.    Cases Involving Aggravated Identity Theft.

Prior to February 2025, the United States Attorney for the Eastern District of Virginia routinely moved to dismiss Aggravated Identity Theft ("AGG ID") charges upon a defendant's entry of a guilty plea to fraud crimes or conspiracy to commit fraud. On information and belief, this was the policy in this district for many years, and such dismissals occurred routinely over the last decade. This policy remained even in the months preceding Mr. Rahbar's plea, where one of the same prosecuting attorneys repeatedly filed motions to dismiss the AGG ID counts in cases with similar charges. *See, e.g., United States v. Santiago*, 1:23-cr-193, Dkts. 55 & 63 (E.D. Va. May 3, 2024) (government motion to dismiss AGG ID counts against two defendants' following guilty pleas to conspiracy to commit wire fraud); *United States v. Desirade*, 1:24-cr-40, Dkts. 106 & 75 (E.D. Va. Oct. 2, 2023) (government motion to dismiss AGG ID counts against two defendants as part of plea to conspiracy to commit bank fraud); *United States v. Willhoit*, 1:22-cr-191, Dkts. 148, 169, 174 & 192 (E.D. Va. June 14, 2023) (government moves to dismiss multiple AGG ID counts against four different defendants as part of guilty plea to multiple counts of bank fraud); *United States v. Agbere*, 1:21-cr-223 (government motion to dismiss multiple counts of AGG ID as part of defendant's plea to two counts of bank fraud); *see also United States v. Merritt*, 1:24-cr-98, Dkt. 94 (E.D. Va. Nov. 13, 2024) (government motion to dismiss AGG ID count as part of defendant's plea to bank fraud).

In PPP loan fraud cases, dismissal of the AGG ID counts as part of a guilty plea to the fraud or conspiracy to commit fraud has been routine throughout the United States. *See, e.g.,*

*United States v. Ramos-Hernandez*, 24-CR-00252, Dkt. 3 at 1, 12; Dkt. 41 (D. Puerto Rico, April 8, 2025); *United States v. Hayes*, 22-CR-00224, Dkts. 1 & 26 (D. Md. April 18, 2023); *United States v. Aqeel*, 20-CR-00583, Dkt. 136 at 23-24; Dkt. 276 (S.D. Tex. Oct. 31, 2022) Southern District of Texas (2023) *United States v. Staveley*, 20-CR-00074, Dkt. 51 (D. R.I. Oct. 12, 2021) (Gov't moves to dismiss Agg ID counts following defendant's guilty plea to PPP loan fraud); *United States v. Sadleir*, 20-CR-00320, Dkt. 87 (S.D.N.Y., Sept. 9, 2022) *United States v. Tisone*, 22-CR-00039, Dkt. 19 at 16; Dkt. 59 Dkt. (M.D. Fla., Aug. 29, 2022); *United States v. Eldabbagh*, 21-CR-00523, Dkt. 1 at 16-17; Dkt. 29 (D. D.C. April 8, 2022).

In early April, the Government informed Defense counsel for the first time that any guilty plea must include an AGG ID charge because Mr. Rahbar had not agreed to plead guilty before the motions hearing in February. On information and belief, Defense counsel understands this to be a new policy established after President Trump took office.

Mr. Rahbar has taken accountability for the underlying conduct, including the conduct at the heart of the AGG ID charge: when filling out the BF Chinatown loan application, Mr. Rahbar used personal identifying information that Mr. Pierre retrieved from resumes submitted by individuals interested in applying for a position at BYNDfit. Although Mr. Rahbar pled guilty to AGG ID, the United States Attorney's unannounced change in policy is arbitrary and selective in that it imposed a serious mandatory minimum punishment on Mr. Rahbar solely because he pleaded guilty two months too "late," even though defendant's who committed far more serious fraud crimes—of which their AGG ID offenses were a central component to the conspiracies—faced no such minimum sentence.

Such an arbitrary and selective policy works a unique unfairness in this case because neither counsel nor their client was aware that this was a possibility as it ran counter to the existing

policy in this district, counsel's prior experience, and a nationwide practice in PPP loan fraud cases. As such, we respectfully request a variance equivalent to the mandatory minimum sentence of twenty-four (24) months required for a conviction of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.

For all these reasons, significant variance is warranted in this case to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(6).

## IV.    IMPOSITION OF A FINE.

Although the Court is authorized to impose a fine in this case, pursuant to U.S.S.G. § 5E1.2(e), Mr. Rahbar requests no fine be imposed because, as the it does not appear that he would be capable of paying a fine within the advisory guideline range or the costs of incarceration or supervision." PSR at ¶ 97.

## V.    RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BUREAU OF PRISON.

After a sentence of imprisonment is imposed the Bureau of Prisons (BOP) begins the process of designating the offender to a facility for service of the sentence (18 U.S.C. § 3621). The BOP retains exclusive discretion to assign prisoners to any of its facilities, but the Court may specifically make recommendations at sentencing that the BOP will indeed consider. 18 U.S.C. § 3621(4)(A) & (B). Mr. Rahbar respectfully requests that the Court recommend a facility as close to Northern Virgina, where his mother and most of his support community reside. Accordingly, if his security level allows, Mr. Rahbar respectfully requests the Court recommend he be designated to FPC Cumberland.

## VI.    COMMUNITY RE-ENTRY AND REHABILITATION.

To maximize Mr. Rahbar's reintegration and transition back to society upon completion of his sentence, the Defense requests the Court include in its order a recommendation that he

eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law. The Second Chance Act (through 18 U.S.C. § 3621) authorizes the BOP to transfer inmates to community confinement during the last year of their term, provided they have demonstrated need for reintegration services. Mr. Rahbar, therefore, respectfully requests the Court to recommend that he be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

## VII.    CONCLUSION.

For all these reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. Rahbar respectfully requests that this Honorable Court impose a total sentence of between thirty and thirty-six (30–36) months imprisonment followed by three (3) years of supervised release.


Dated: September 18, 2025                    Respectfully submitted,


/s/                                          /s/
Joseph Flood, VSB #71716                     Patrick F. Stokes *(admitted pro hac vice)*
SHELDON & FLOOD, PLC                         Alyse Ullery *(admitted pro hac vice)*
10621 Jones Street, Suite 301-A              GIBSON, DUNN & CRUTCHER LLP
Fairfax, V.A. 22030                          1700 M Street, N.W.
Telephone: 703.691.8410                      Washington, D.C. 20036
Email: jflood@sfhdefense.com                 Telephone: 202.955.8500
                                             Email: pstokes@gibsondunn.com
                                             Email: aullery-glod@gibsondunn.com

                                             *Attorneys for Defendant Raymond Rahbar*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September, 2025, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will generate a Notice of Electronic Filing to all parties of record.

/s/
_____
Joseph T. Flood
SHELDON & FLOOD, PLC
10621 Jones Street, Suite 301-A
Fairfax, V.A. 22030
Telephone: 703.691.8410
Email: jflood@sfhdefense.com

*Attorney for Defendant Raymond Rahbar*