# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RAYMOND RAHBAR,<br><br>*Defendant*. | Case No. 1:24-cr-180<br><br>The Honorable Patricia Tolliver Giles<br><br>**Sentencing**: September 25, 2025 |

## THE UNITED STATES' POSITION ON SENTENCING

The United States of America, through its undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position with respect to sentencing of Raymond Rahbar, Jr. ("the defendant" or "Rahbar"). The defendant comes before the Court for sentencing after pleading guilty to two counts in the 14-count Superseding Indictment: Count 1, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; and Count 12, aggravated identity theft, in violation of 18 U.S.C. § 1028A. Presentence Investigation Report ("PSR") ¶¶ 1–2.

Probation determined the advisory Guidelines range to be 135 to 168 months for Count 1, and a mandatory two-year consecutive sentence for Count 12. The United States agrees that Probation properly calculated the Guidelines. After careful consideration of the statutory factors, the United States recommends that the Court sentence Rahbar to 159 months[1] imprisonment and impose a three-year term of supervised release. Such a sentence would be sufficient but not greater than necessary to accomplish the sentencing objectives of Section 3553(a).

---

[1] This recommendation contemplates (a) a 135-month sentence for Count 1; and (b) a 24-month sentence for Count 12 to run consecutive to the sentence for Count 1.

1

*Factual Background*

In 2018, Rahbar attempted to start a fitness hall called BYNDfit. To do so, Rahbar enlisted the help of his friend and former coworker Ryan Macaulay. Rahbar and Macaulay then brought on Carl Pierre as a third co-founder. Over the next few months, BYNDfit created a series of corporate entities to manage the affairs of BYNDfit: BF Chinatown, BF Management, and BF Georgetown. Rahbar planned to use these entities to facilitate the expansion of BYNDfit from its initial location in the Chinatown neighborhood of Washington, D.C. PSR ¶ 18.

By March 2020, BYNDfit had hired a few employees. According to tax records, all BYNDfit employees worked for BF Management. Specifically, BF Management claimed it paid five employees a total of $145,804 in the fourth quarter of 2019 and one employee a total of $3,572 in the first quarter of 2020. No other BYNDfit entity reported employees on their federal taxes in 2019 or the first quarter of 2020. Additionally, BYNDfit had plans to hire additional people. To find interested candidates, BYNDfit attended career fairs at local schools including Georgetown. At these career fairs, BYNDfit obtained the name and other personal identifying information ("PII") for interested college students. Few if any of these candidates, however, worked at BYNDfit.

The COVID-19 pandemic began before BYNDfit could open either of its planned locations. As a response to that pandemic, on March 27, 2020, Congress, through the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES Act," authorized the Small Business Administration to offer loans to companies affected by the public health emergency. Pub. L. No. 116-136, 134 Stat. 281 (2020). Some of these loans came via the Paycheck Protection Program (the "PPP"). Through the PPP, lenders could provide forgivable, government-backed loans to certain small businesses. To qualify for a PPP loan, an

applicant had to meet certain criteria that were designed to ensure that the program's assets would be used to forestall widespread layoffs and economic collapse. The application for a PPP loan required a business to certify, among other things, that it was "in operation on February 15, 2020 and either had employees for whom [it] paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC." Applicants also had to certify that they would use the money only for authorized expenses such as payroll and rent. PSR ¶¶ 20–24. The amount of the loan that could be approved under the program was a function of the applicant's *historical* payroll costs, subject to certain exclusions. Similarly, Congress also authorized the Small Business Administration to offer loans under the Economic Injury Disaster Loan program ("EIDL"). Unlike the PPP loans, EIDL loans are not forgivable and must be repaid.

Rahbar spent the next several months sending PPP applications to banks across the country. These applications were rife with misrepresentations and outright lies. Despite employing a small handful of people, Rahbar claimed BYNDfit employed over 50 people. Rahbar listed as "employees" his elderly mother, family friends, unpaid vendors, and investors. Rahbar even used the names and PII of the unsuspecting potential interns to bolster the PPP applications. In support of his fraudulent applications, Rahbar attached fabricated tax forms that matched the bogus employee count included on his PPP applications. PSR ¶¶ 26–31.

### *Legal Standard*

The standards governing this Court's sentencing are well established. This Court must consult the Guidelines as well as the factors set forth in 18 U.S.C. § 3553(a) when making a sentencing decision, though the Guidelines are purely advisory. *See United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552

U.S. 38, 49 (2007). "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Section 3553(a) sets out a variety of factors that the Court should consider in determining the defendant's sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," among others. 18 U.S.C. § 3553(a)(1)–(2)(A) & (B).

*Application*

I. **Sentencing Guidelines Calculation**

The PSR found, and the United States agrees, that Rahbar's Guidelines range is as follows:

| | | |
|---|---|---:|
| Base Offense Level | | 7 |
| Adjustments | | |
| | Loss amount more than $3.5 million | +18 |
| | 10 or more victims | +2 |
| | Misrepresentation during a bankruptcy proceeding | +2 |
| | More than $1,000,000 from a financial institution | +2 |
| | Abuse of position of trust | +2 |
| | Leader of criminal activity | +4 |
| | Acceptance of responsibility | -2 |
| **Total Offense Level** | | **33** |

4

Rahbar's criminal history is Category I. PSR ¶ 73; U.S.S.G. §§ 4A1.1, 4A1.2. This criminal history category, coupled with Rahbar's adjusted offense level of 33, yields an advisory Guidelines range of 135 to 168 months for Count 1 and a mandatory two-year consecutive sentence for Count 12. PSR ¶¶ 98, 99; U.S.S.G. § 5A.

## II. The Correctly Calculated Guidelines

### A. *Rahbar caused millions in losses which should not be offset by his few legitimate employees.*

The PSR properly calculates the loss amount at just over $4,000,000. PSR ¶¶ 39–44. This amount includes the actual and intended losses caused by Rahbar's criminal scheme. Noting that he had some legitimate employees and spent the money on some legitimate expenses, Rahbar asks the Court to reduce the loss amount. PSR Addendum, p. 23. As explained below, this argument finds no support in the Guidelines or the law, and the Court should reject it.

First, Application Note 3 of U.S.S.G. § 2B1.1 explains that loss amount can be the fair market value of the property unlawfully taken. This section explicitly defines situations where the defendant is entitled to a credit against the loss amount. Because this offense does not involve money returned to the government, collateral pledged by the defendant, or interest payments, none of these apply to this situation. Furthermore, in a case involving government loans, the loss "shall be considered to be not less than the value of the benefits obtained." N. 3(E)(ii). Taken together, these provisions make clear that the loss amount should include the full value of the loans.

Second, even if the Court decided to reduce the loss amount by the amount of money Rahbar could have legitimately obtained through the PPP, this would not change the Guidelines range. The PPP only allowed employers to obtain loans for employees for whom they paid payroll taxes before the pandemic. Only one of the entities reported paying payroll taxes during

the relevant period. Specifically, BF Management's tax records show BF Management paid five employees $145,804 in the fourth quarter of 2019. Applying the PPP formula, BF Management could have received no more than $121,503 from the PPP. This amount of money would not take the loss amount below $3.5 million and thus would not result in a reduction of the offense level. PSR Addendum p. 23.

Third, Rahbar asks the Court to exclude from the loss amount money he spent on legitimate expenses. PSR Addendum p. 23. Like the others, this argument finds no support in the Guidelines. Worse still, it overlooks the fact that the money was unlawfully obtained in the first place. It doesn't matter if he spent it on business expenses if he was not entitled to it in the first place. *Id.* pp. 23–24.

      B.    *Rahbar abused his position of trust to perpetrate this crime.*

The Guidelines appropriately included an enhancement pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust. PSR Addendum p. 24. This enhancement applies where a defendant "exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification." U.S.S.G. § 3B1.3 n. 2. That is precisely what happened here. As CEO of BYNDfit. Rahbar had access to the personal identifying information of actual and potential employees. Rahbar used this PII—which qualifies as a means of identification under 18 U.S.C. § 1028(d)(7)—in furtherance of his criminal scheme. Specifically, Rahbar took the PII and used it without authority to file fraudulent PPP applications. Even if Rahbar had lawful access to this information, he exceeded the scope of his access by using it unlawfully. PSR ¶ 48. This conduct falls squarely within the scope of this enhancement.

      C.    *Rahbar's crimes harmed at least 10 victims.*

The PSR correctly noted that Rahbar harmed more than 10 victims. PSR Addendum p. 25. These victims include the four banks who were tricked into approving the PPP loans, the SBA who backstopped the PPP and EIDL program, and the individuals who had their PII used in support of the PPP applications. Law enforcement interviewed dozens of people whose identity was used without their permission including, but not limited to, Halimah Bereday, Britta Nordstrom, Lara Adekunle, Caroline Frock, and Tracey Nguyen[2]. Between the banks, the government, and the individuals, Rahbar victimized more than 10 people. This enhancement is appropriate.

### III.    Statutory Analysis of the Section 3553(a) Factors

Based on the circumstances of this case and after consideration of the 3553(a) factors, the United States recommends that the Court sentence Rahbar to 159 months imprisonment and impose a three-year term of supervised release. Such a sentence would be sufficient but not greater than necessary to accomplish Section 3553(a)'s sentencing objectives.

      A.    *The recommended sentence is necessary based on the nature, circumstances, and seriousness of the offense.*

As this Court is aware, the COVID-19 pandemic claimed over one million American lives, and many more world-wide. It disrupted life, for everyone, profoundly. Among other actions to combat the pandemic, the CARES Act, generous by design, made billions of government-guaranteed loans available to qualified small businesses through the PPP. PPP loans were forgiven entirely so long as the proceeds were used for authorized business expenses designed to help struggling companies survive: payroll, utilities, rent, premiums to keep health care benefits in

---

[2] The 302s of interviews with Bereday, Adekunle, and Nordstrom are attached as Exhibit A.

force, and just enough to pay the interest (but not the principal) on a company's pre-existing mortgage or other business loan.

While millions of Americans were struggling, Rahbar and Macaulay were frustrated by the pandemic's impact on their already struggling gym venture. To bolster the cash-strapped project and alleviate the strain from existing creditors, Rahbar and Macaulay plotted to obtain PPP loans by fraud to generate cash flow for a fitness center that had yet to open. PSR ¶ 38. Rahbar fabricated payroll reports, generating them by including the names of unwitting family, friends, and Georgetown University students who merely listed their name on a sign-up sheet at a job fair. PSR ¶ 36. To further paper their fraud, Macaulay and Rahbar concocted false IRS Forms 940 and 941, claiming their businesses had paid thousands in payroll to fictious employees, when, in many instances, the companies had never filed the forms at all. PSR ¶¶ 23, 30.

Once the banks approved the loans and disbursed the funds, Rahbar and Macaulay engaged in a complicated series of transactions designed to obscure the real use of these funds. To fraudulently spend the loans, Rahbar and Macaulay signed up numerous people, some of whom were not even listed on the fake PPP application payroll, as employees using a payroll processor. Rahbar and Macaulay then caused the payroll processor to send the PPP money to their friends and family, many of whom were not even expecting any money at all. To get these funds back to keep the business idea afloat, Rahbar asked these individuals to send most of that money back to BYNDfit so they could spend the money on unauthorized purchases.

Further, Rahbar's conduct went beyond that of Macaulay's in three key ways: (1) he obtained additional PPP loans for other entities he controlled; (2) he abused the bankruptcy system; and (3) he committed aggravated identity theft. First, Rahbar, using the same type of misrepresentations about the number of employees, obtained four additional PPP loans on behalf

8

of two construction entities that he controlled, AMC Building Group and American Majestic Construction, totaling nearly $1.3 million. PSR ¶ 42. He also submitted loan applications for 8533 Georgetown, totaling nearly $480,000, but was not successful in obtaining the loans.

Second, Rahbar caused BYNDfit to serially file for bankruptcy, looking for new and creative methods to file after each bankruptcy was dismissed as being filed in bad faith. PSR ¶ 38. During one of the bankruptcy proceedings, Rahbar made multiple false statements regarding how much BYNDfit paid in payroll. For example, during an August 3, 2023 hearing in the U.S. Bankruptcy Court for the Eastern District of Virginia, Case No. 23-10919-BFK, the defendant was asked about BF Management's second draw PPP loan from City First Bank for $244,945 in 2021. Specifically, when asked whether the Form 941 for the first quarter of 2020, filed in support of the application and listing payroll costs of $246,666.66 was accurate, the defendant replied, "I believe so, yes," when in fact BF Management had reported less than $4,000 in wages to the IRS and DC DOES for that quarter. *Id.* Realizing he had to continue to cover up his lies, Rahbar only doubled down to meet his goals of fraudulently borrowing money supposedly for a failing business and then fraudulently obtaining a discharge of that failing business's debt.

Third and finally, the defendant pleaded guilty to aggravated identity theft for his unauthorized use of an individual's information to apply for a PPP loan. While some of these individuals provided PII to the defendant and his coconspirators believing they may some day obtain a job with BYNDfit, none of these individuals were ever informed—or consented—to having the defendant use their information to apply for and obtain millions in PPP loans. PSR ¶ 36.

      B.    *The recommended sentence would deter fraudulent conduct and promote respect for the law.*

The history and characteristics of the defendant support a meaningful carceral sentence. Although the defendant has no scored criminal history, the scope of this conspiracy, the number of fraudulent loans at issue, the leading role the defendant played in the scheme, all suggest he needs to receive a substantial jail sentence to drive home the message that these sorts of crimes do not pay. The defendant's fraud was calculated and repetitive, spanning six different entities and 13 separate loan applications. PSR ¶¶ 39–43. The scope and volume of the scheme led by the defendant and Macaulay using numerous business entities to defraud illustrate how their criminal conduct became seen as a normal source of income for their failing gym, themselves, and their friends. Rahbar, in fact, sent $400,000 in PPP funds to his personal accounts claiming "rent" to fund his personal expenditures. PSR ¶ 37. As the mastermind and CEO of this business concept, BYNDfit, and the one others in the company looked to as the business aficionado, Rahbar held a unique position of trust and leadership compared to his coconspirators and colleagues. Indeed, the Sentencing Commission noted in its "background" commentary to § 3B1.1 that the upward adjustment for leadership, in part, is based on the view that persons who organize and lead extensive criminal conduct involving multiple individuals inherently pose a higher risk of recidivism. For those reasons, a significant jail sentence is necessary for this defendant to understand the nature of his role in this scheme and the culpability he shares for these offenses.

Rahbar had multiple opportunities to stop his criminal conduct, yet he persisted and came up with a uniquely sophisticated way to attempt to cover up his fraud: bankruptcy. Rahbar caused BYNDfit and its associated entities to repeatedly file for bankruptcy, undeterred when each one was dismissed after the bankruptcy court found they were filed in bad faith. PSR ¶ 38.

As a result, a significant, but not excessive sentence, is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

They are therefore more susceptible to general deterrence and more in need of a significant sentence to achieve that deterrence. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). Moreover, crimes like this are lucrative and can be difficult to detect. As here, the defendant and his coconspirators use a vast series of payment methods to disburse the PPP funds (checks, payroll processor), and then a vast series of methods to recoup that money (with the defendant directing PPP fund recipients pay back funds via Venmo and other means), and then yet another series of bank accounts to move the money between entities and individuals. *See, e.g., United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

And until the end, Rahbar maintained that their method of counting employees and expenditures were all lawful in the name of trying to save BYNDfit. In one instance when a lender questioned Rahbar about his method of counting employees in a PPP application, Rahbar emailed back the lender and falsely claimed that Josh Wu, his attorney and friend, who held a federal government position at the time, blessed Rahbar's methodology. In reality, all these actions were lies, and they were criminal. A significant sentence is, therefore, necessary to send the appropriate message to this defendant—and more importantly, to all those that may seek to abuse government-funded assistance programs—that those who engage in this conduct will be caught and punished significantly.

      C.     *The recommended sentence would avoid unwarranted sentencing disparities.*

As the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was appropriate, and was not a disparity, but a justifiable difference); *see also United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012) (*quoting United States v. Smith*, 510 F.3d 603, 610 (6th Cir.2010)) ("To find an unwarranted disparity in this case would allow defendants to bind district courts according to the most lenient sentence that another court had imposed for a similar crime.")."

Rahbar and Macaulay will be sentenced on the same day. Coconspirator Macaulay has far lower guidelines of 63 to 78 months, due to Rahbar having: (1) a greater loss amount as he obtained additional loans for construction entities he controlled; (2) an enhancement for a misrepresentation in a bankruptcy proceeding; (3) an enhancement for abusing a position of trust as the CEO of the BYNDfit entities; (4) an enhancement reflecting that Rahbar derived more than $1 million in gross

receipts from the fraud; and (5) pleaded guilty to aggravated identity theft which carries a two-year mandatory minimum sentence to be served consecutive to other counts. PSR ¶¶ 53–59, 99. It is uncontroverted that Rahbar played the leading role in the BYNDfit business and the resulting fraud scheme. As a result, Rahbar should receive a sentence commensurate with the additional aggravating factors and one longer than his business partner, Macaulay.

Separately, coconspirator Pierre had exposure far more limited than the defendant, pleading guilty to only one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349. As a result, Pierre's sentence of one day incarceration and three years of supervised release is inapposite. *See United States v. Pierre*, 1:24-cr-173 (Dkt. Nos. 23, 24).

## *Conclusion*

For the reasons stated above, the United States respectfully recommends the Court sentence Rahbar to 159 months incarceration and a three-year term of supervised release. Such a sentence would be sufficient but not greater than necessary to accomplish Section 3553(a)'s sentencing objectives.

Respectfully submitted,

Erik S. Siebert
United States Attorney

September 19, 2025     By:     /s/
                               Kristin S. Starr
                               Avishek Panth
                               Assistant United States Attorney
                               United States Attorney's Office
                               Eastern District of Virginia
                               2100 Jamieson Avenue
                               Alexandria, Virginia 22314
                               Phone: (703) 299-2700

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record. I will also send a copy to the United States Probation Officer.

                          /s/
                          Kristin S. Starr
                          Assistant United States Attorney